## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

**AGATHA and MALCOLM COOPER, Parents,**
       **individually, and on behalf of J.N., Student,**

       **Plaintiffs,**                                              **No. 19cv1141**

**v.**

**BOARD OF EDUCATION OF ALBUQUERQUE**
**PUBLIC SCHOOLS, and NEW MEXICO PUBLIC**
**EDUCATION DEPARTMENT,**

       **Defendants.**

### COMPLAINT  to remedy
### DISABILITY DISCRIMINATION in public education,
### seeking damages under federal and state law,
### and civil action for fees under IDEA

### I.  PRELIMINARY STATEMENT

1.      This case follows a 2019 administrative IDEA due process hearing in

Albuquerque, New Mexico, for eight year old J.N., a child with autism, who was physically

restrained at school,  in contravention of New Mexico state law,  multiple times during the 2017-

18 and 2018-19 school year until his parents were forced to remove him from Albuquerque

Public Schools (APS)  attendance  in order to protect their son from traumatic physical restraints

and restore his physical and emotional safety.  The Due Process Hearing Officer decision found

in favor of the family and determined that APS had denied J.N. free appropriate public education

under the federal special education law,  Individuals with Disabilities Education Act (IDEA).

2.      New Mexico state law to limit and regulate the use of physical restraint in public

schools (NMSA §22-5-4.12)  was effective on June 16, 2017, a few months before J.N. began

kindergarten at Bandelier Elementary School in the Albuquerque Public Schools.

3.      Despite an effective date in June 2017, NMPED failed to enact regulations to implement NMSA §22-5-4.12 for more than one year.  When regulations were finally enacted on July 1, 2018, NMPED failed, at all material times, and continues to fail,  to enforce state law in New Mexico public schools,  including APS, where hundreds of students continue to be exposed to dangerous and chaotic, repeated reliance on physical restraint by staff not trained in evidence based  strategies to respond to students' nonconforming behaviors.

4.      The only way Parents had to protect J.N. from APS's unregulated reliance on physical restraint was to quit sending him to public school in January 2019.   They were forced into giving up J.N.'s  right, as a student with a disability, to public education.

5.      Physical restraint in public schools is disproportionately used against students with disability,  including in the Albuquerque Public Schools, where J.N. was repeatedly physically restrained in violation of state law and the exercise of professional judgment.


II.  OVERVIEW of all CLAIMS

**claims against APS**

6.     This action against APS seeks a) damages for Plaintiffs and J.N. for disability discrimination against J.N. and his parents; b) damages for J.N.'s injury under state law caused by negligence of APS;   and also c) seeks award of attorney fees and costs under IDEA,  based on parents' status as prevailing parties at the IDEA administrative due process hearing, as well as attorney fees and costs under Section 504 of the Rehabilitation Act related to the disability discrimination case.

7.      This action against APS is also a proposed class action for injunctive relief on

behalf of J.N. and other APS students in a proposed class of APS students with disability who are repeatedly exposed to physical restraint in APS.  The action seeks changes in APS's polices and practices concerning use of physical restraint against its students in order to conform to state law.

**claims against NMPED**

8.   This action against NMPED is a proposed class action seeking equitable relief for J.N and other APS students in a proposed class of students with disability who were and continue to be repeatedly exposed to physical restraint during the school day in the Albuquerque Public Schools, and seeks injunctive relief ordering changes in NMPED's regulations and its role in implementation and monitoring of NMSA 22-5-4.12 in the Albuquerque Public Schools.

III.  JURISDICTION and EXHAUSTION OF ADMINISTRATIVE REMEDIES

9.    This Court has jurisdiction pursuant to the Individuals with Disabilities Education Act (IDEA) (20 U.S.C. §1415(i)(3)(A)), Section 504 of the Rehabilitation Act, 29 U.S.C. §794 *et seq.,* and pendent jurisdiction over the state law negligence claim.

10.    Plaintiffs have exhausted administrative remedies available for J.N. under the IDEA, pursuant to 20 U.S.C. §1415(l).

IV.  PARTIES, VENUE

11.    Malcolm and Agatha Cooper ("Parents")  are the parents of J.N., a minor child.

12.    At all material times, J.N. was a school-aged New Mexico resident living within the boundaries of the Albuquerque Public Schools District who had a disability, qualified for receipt of special education pursuant to the IDEA under the eligibility of Autism, and had an IEP

(Individualized Education Plan).

13.     J.N.'s autism creates impairment which limits one or more major life activities, including learning and social communication.

14.     J.N. is a qualified handicapped person within the meaning of Section 504 of the Rehabilitation Act in that he has a disability which limits major life activities and he is a school aged person entitled to receipt of public education.

15.     Defendant Board of Education of Albuquerque Public Schools is established by the New Mexico Constitution and state law as the entity which supervises and controls Albuquerque Public Schools.  Pursuant to state law, the Board of Education is the legal entity to be sued for claims against Albuquerque Public Schools.

16.     Albuquerque Public Schools ("APS" or "the School District" or "LEA") is J.N.'s Local Educational Agency (LEA) within the meaning of the Individuals with Disabilities Education Act (IDEA).

17.     The School District receives federal funding and must comply with Section 504 of the Rehabilitation Act ("Section 504") which prohibits discrimination on the basis of disability.

18.     Defendant New Mexico Public Education Department (NMPED) is a cabinet level department of the State of New Mexico charged with uniform enforcement of the Public School Code, among its other statutory duties.  NMSA §22-2-2(A).

19.     New Mexico Public Education Department (NMPED) is J.N.'s State Educational Agency (SEA) within the meaning of the IDEA.

20.     New Mexico Public Education Department (NMPED)  receives federal funding and must comply with Section 504 of the Rehabilitation Act which prohibits

discrimination on the basis of disability in the delivery of public education.

## V.  TIMELINESS OF COMPLAINT

21.     On April 11, 2019,  Parents filed a Request for IDEA administrative due process

hearing against APS because J.N. was being denied free appropriate public education (FAPE) by

the School District.  (hereinafter referenced as DPH 1819-23).

22.     Following appointment of a due process hearing officer by NMPED, a due

process hearing was conducted in Albuquerque, New Mexico over nine days in June, July, and

August 2019.  More than 35 witnesses testified and hundreds of pages of exhibits were admitted

into evidence.

23.      The Due Process Hearing Officer (DPHO)  issued a final written decision in DPH

1819-23  on November 4, 2019, which decision was also received on November 4, 2019.

24.     The DPHO administrative decision held that APS had denied J.N. a free

appropriate public education (FAPE) and ordered extensive remedy be undertaken by APS as to

provision of appropriate special education and services to J.N.

25.     Parents were the prevailing parties at the IDEA administrative due process

hearing.

26.     Pursuant to state special education regulation implementing IDEA, a civil action

for attorney fees must be filed within 30 days of receipt of the Due Process Hearing Officer's

decision.  §6.31.2.13(I)(26)(b) NMAC.

27.     This civil action is timely as to claim against APS for attorney fees under IDEA,

being filed within 30 days of receipt of the Due Process Hearing Officer's final decision.

28.     This complaint is timely as to the negligence claim for J.N. against APS, being

filed within the two year statute of limitations of the New Mexico Tort Claims Act.

29.     This complaint is timely as to the Section 504 discrimination claims for Plaintiffs,

individually and on behalf of J.N.,  as well as the proposed class of students with disability ,

being filed  after exhaustion of administrative IDEA remedies for J.N.,  and within the three year

statute of limitations for disability discrimination claims in New Mexico.


VI.  FACTS

30.     J.N. is a bright, precocious, charismatic 8 year old boy whose

multitude of interests about the world range from black history to creating his own scientific

experiments and projects.  He has been accurately described as an "old soul."

31.     J.N. has autism; he also has been medically diagnosed with anxiety, secondary to

autism.

32.     Autism is a complex, neurodevelopmental disorder which impairs functional,

social communication which is the core deficit of autism.

33.     According to federal special education regulation implementing IDEA,

> Autism means a developmental disability significantly affecting verbal
> and nonverbal communication and social interaction. . . that adversely
> affects a child's educational performance.  Other characteristics
> often associated with autism are engagement in repetitive activities
> and stereotyped movements, resistance to environmental change or
> change in daily routines, and unusual responses to sensory experiences.
> 34 C.F.R. §300.8( c)(1)(I).

34.     According to the United States CDC (Center for Disease Control and Prevention),

1 in 59 children in the United States has autism.

35.    Albuquerque Public School has 82,000 students.  Based on national statistics, APS would currently have more than 1,300 students with autism.

36.    In January 2011, nearly nine years ago, NMPED identified "best practices" for working with students with autism and enacted state special education regulation on the "best practices," known as the "11 considerations" for students with autism.  *See* §6.31.2.11(B)(5) NMAC.

37.    However, in the nearly nine years which have elapsed since the state identified "best practices" which should be available in providing education to students with autism,  the numbers of students with autism has exploded and  neither APS nor NMPED requires any program of training or specialized certifications for teaching and support staff regarding autism.

38.    "The APS Executive Director for special education compliance does not see a need for school staff to be trained in the state-mandated 11 considerations for students with autism."  *See* final decision in DPH 1819-23, Finding of fact 70.

39.    APS instead requires that all Educational Assistants, Community Support Liasons, Health Aides, Campus Assistants and Redirectors (hereinafter "support staff") receive nonviolent crisis intervention training (NVCI), which includes how to perform physical restraints.

40.    APS also requires that staff (teachers and support staff) who work in District level special education programs for students with disabilities all have NVCI training which includes how to perform physical restraints.

41.    New Mexico enacted state law to limit and regulate the use of physical restraint and  seclusion in public schools in 2017,  with an effective date in June 2017.  *See,* NMSA §22-5-4.12.

42.     NMPED did not enact any  regulation to implement state law
intended to limit and regulate use of physical restraint in schools until July 2018, more than one
year after NMSA 22-5-4.12 regulating physical restraint in public schools became effective.

43.     During the 2017-18 school year, when there was no state regulation, APS
continued to have policy, as articulated in the APS Student Handbook (2017-18), which
contradicted the new state law intended to limit and regulate use of physical restraint against
New Mexico students.

44.     J.N. entered APS as a kindergarten student at Bandelier Elementary School
in August 2017.

45.     By the middle of his kindergarten year (January 2018) or earlier, J.N.
demonstrated characteristics of a student with autism at school.  However, APS ignored his
need for evaluation and failed and refused to evaluate or provide special education during
kindergarten.

46.     During the summer between kindergarten and first grade, Parents obtained
a private evaluation in July 2018 which diagnosed J.N. with autism.

47.     Although Parents provided APS with J.N.'s autism diagnosis and requested
identification for special education repeatedly, APS delayed such identification until then end of
November 2018, at which time the School District wrote Student's first IEP and moved him to a
district"social communication" special education program for students with autism at a different
elementary school, Collett Park Elementary,  beginning around December 1, 2018.

48.     Even after identifying J.N. as a student with autism and writing an IEP providing
for special education services, APS was unwilling or unable to meet J.N.'s unique needs as a

child with autism and anxiety because staff lacked sufficient training and support on evidence based practices for students with autism.

49.    During the school years that J.N. was repeatedly physically restrained, there was an "autism training vacuum" in the Albuquerque Public Schools.  *See* final decision in DPH 1819-23, Finding of fact 110.

50.    In December 2018 and January 2019, staff at Collett Park Elementary relied on physical restraint to respond to J.N.'s nonconforming behaviors,  just as Bandelier staff had done in the year and one-half preceding APS's identification of J.N. as a student with autism who needed special education.

51.    During the 2017-18 school year and fall 2018, when J.N. was physically restrained by multiple staff on multiple occasions at Bandelier Elementary, Parents were not informed or provided the notice required by state law since June 2017.   When J.N. was physically restrained by multiple staff at Collett Park in 2018-19, Parents were provided written notice on two occasions although the written notice was noncompliant with state law and was incomplete or inaccurate.

52.    During his attendance at Bandelier in the fall of 2018, Parents did become aware that J.N. was being restrained because,  on several instances, they saw him restrained by staff and on one instance his brother (also a student at Bandelier)  saw him restrained by staff and physically carried off the playground to a portable where J.N. was isolated away from view and other children,  while he continued to be physically restrained.

53.    When APS identified J.N. as a student with autism and moved him into a special education "social communications" program classroom for students with autism at Collet

Park (end of November 2018) , APS staff assured Parents that J.N. would now be with staff who had specialized knowledge and training about autism and would not rely on restraint.

54.    To encourage J.N. in making the transition to a new unfamiliar school, and in reliance on APS staff assurances, Parents assured J.N. that he would not be subjected to physical restraints by staff at Collet Park. J.N. relied on Parents' promises which had been made based on APS staff's assurance.

55.    J.N. was then restrained by staff at Collett Park during his first two weeks. He was again terrified of being held down by adults at school and now also felt betrayed — by his parents who had told him he would be safe in reliance on APS's assurances.

56.    Parents repeatedly explained to staff at Collett Park that J.N. experienced all physical restraint as trauma, that he was fearful and anxious about being held down, and that he was injured physically and emotionally with each restraint. Paperwork created by his teacher at Collet Park acknowledged that he had "a large fear of people putting their hands on him."

57.    Despite specific knowledge and warning, staff at Collett Park again physically restrained J.N. on January 22, 2019 . After this restraint and based on the regression they witnessed in their son because of the restraints and his heightened fears about restraints at school, Parents elected to have J.N. stay out of school until APS could come up with a plan and staffing so that he could receive appropriate education and not be subjected to physical restraint.

58.    Up to this date of filing, APS has not identified any elementary school which can meet J.N.'s needs as a student with autism and which does not rely on use of physical restraint and so he is not attending APS or receiving any public education.

59.    J.N. remains out of school, having been enrolled in "home school" for the 2019

20 school year, not because Parents have voluntarily chosen "home schooling" over public education but because "home school" is the only option Parents have for keeping Student safe.

60.     In 2017, New Mexico enacted state law to regulate the use of physical restraint and seclusion in public schools, in recognition that these "techniques" were not education and that use of the techniques was dangerous for staff and students and caused trauma.

61.     Among the features of the state law regulating physical restraint in New Mexico's public schools, are the following requirements:

(A)     Use of restraint is limited to a situation in which "student's behavior presents an imminent danger of serious physical harm to the student or others" *and* "less restrictive interventions appear insufficient to mitigate the imminent danger of serious physical harm";

(B)     Use of restraint "shall end when the student's behavior no longer presents an imminent danger of serious physical harm to the student or others";

( C)     no restraint technique can be used which "impedes the student's ability to breathe or speak";

(D)     all schools are required to establish policies and procedures for use of restraint in a school safety plan which is to be drafted by a "planning team that includes at least one special education expert";

(E)     same day notice to parents is required whenever physical restraint is used;

(F)     written documentation including specified information is required "within a reasonable time";

(G)     school policy "shall consider school district support and strategies for school employees to successfully reintegrate a student who has been restrained. . . back into the school or classroom environment."

*See* NMSA §22-5-4.12(A),(B),( C), (D).

62.     APS did not act in compliance with NMSA 22-5-4.12 during 2017-18, 2018-19

11

and 2019-20 school year and continuing.

63.    NMPED does not monitor APS or any school district for its compliance with NMSA §22-5-4.12.

64.    Regulations enacted by NMPED (effective July 2018) do not mirror or implement state law limiting and regulating physical restraint  and, instead, tend to promote or gloss over use of physical restraint by public school staff.  *See*  §6.11.2.10(E) NMAC*, and compare,* NMSA §22-5-4.12.

65.    Upon information and belief, the anemic restraint regulations promulgated reflect NMPED's choice to kowtow to New Mexico public school districts, including Albuquerque Public Schools, wishing to retain their unlimited power to physically restrain New Mexico students without limitation and without notice to parents.

66.    APS, having failed to train its staff about J.N.'s needs as a student with autism and having left school staff to repeatedly restrain him in contravention of best practices and his individual needs, then further blamed and stigmatized J.N. and his family by identifying him in secret paperwork as a "severe level threat" in January 2019.  The threat assessment paperwork, while not provided to parents, was provided to the APS police department which created a "file" on J.N., again a file not shared with or provided to Parents.

67.    The APS Threat Assessment forms filled out on J.N. were largely completed by individuals who did not know J.N. and are replete with misinformation and prejudicial assumptions.

68.    The APS Director of Threat Assessments, in lockstep with APS's ongoing misunderstanding and discriminatory treatment of J.N., believes that students with disabilities

can be "scary" because they do not know how to communicate well.

69.    The Threat Assessment paperwork completed by APS in January 2019 and on file with APS police was not made available until after Parents had filed for IDEA due process when it was eventually produced as part of mandatory delivery of educational records.

70.    After learning about the threat assessment paperwork, Parents were interviewed by *Searchlight New Mexico*.   An article about J.N.'s school experience and Parents' concerns about APS's treatment of their son was published on line on October 15 , 2019.

71.    On October 31 , 2019, the Coopers' other son, J.N.'s brother, was pulled out of his classroom at Bandelier Elementary to be "interviewed" by an unknown adult who questioned him extensively about his brother and parents.

72.    Parents were not contacted by anyone from APS about who had interviewed J.N.'s brother.  When Parents made written request to Bandelier's principal, they were told that the person was believed to be from an agency that was"part of CYFD."

73.    Despite several requests to APS, Parents have still been provided no information about who interviewed J.N.'s brother at Bandelier Elementary School on October 31, 2019.

74.    Upon information and belief, any involvement of CYFD in October 2019 may have been based on false reporting by APS staff against Parents in retaliation for their advocacy and information provided to *Searchlight New Mexico* about APS's treatment of J.N.

75.    J.N. has suffered physical and emotional injury from repeated physical restraints at school by APS staff.

76.    Parents have suffered injury from APS's ongoing physical restraints of J.N. along APS's failure to report and accurately document its restraints, which caused deterioration of the

13

parent child relationship and emotional injury.  Parents have also been injured by APS's

retaliation against them and their children for Parents' advocacy in enforcing J.N.'s rights to

special education as well as their advocacy in speaking out to the press about failures of APS

special education, reliance on physical restraint and discriminatory "threat assessment."

### VII. DISABILITY DISCRIMINATION ACTION FOR DAMAGES AGAINST APS

77.    Physical restraint is an aversive intervention; it is not delivery of education or

special education and it is not an effective teaching tool to address nonconforming behaviors.

Use of physical restraint is counterproductive in that it typically escalates and sustains

undesirable behavior.

78.    When a child is physically restrained at school, the child suffers trauma.

79.    "Children . . . with disabilities are at greater risk for experiencing trauma. . . .

[S]tudies have shown that children with disabilities are 3.79 times more likely to be physically

abused . . . than non-disabled children. . . ."  -American Bar Association "Policy on Trauma-

informed Advocacy for Children and Youth."  (Approved by the ABA House of Delegates,

2/10/14).

80.    APS school staff's reliance on physical restraint against J.N. in lieu of delivery of

strategies and interventions supported by research and consistent with evidence based practices

indicates a failure to exercise professional judgment.

81.    APS school staff's reliance on physical restraint to respond to nonconforming

behaviors of children with disabilities, including J.N., is entirely predictable since APS insists

on training school staff on physical restraint and withholds, and does not require,  appropriate

training on needs of and strategies for children with disabilities, particularly children with autism, such as J.N.

82.  APS's longstanding refusal to provide and to require school staff who work with students with autism to receive necessary specialized training, including but not limited to training on New Mexico's 11 considerations for students with autism,  is deliberately indifferent to the needs of students with autism, including J.N. who entered APS more than six years after the 11 considerations were mandated by state regulation.

83.   APS's longstanding embrace of training and reliance on physical restraint by staff as a default response to nonconforming behaviors of children with disability is deliberately indifferent to the rights of children with disability, including J.N., to receipt of public education which is free from discrimination on the basis of disability.

84.   APS's failure to implement state law regulating use of physical restraint beginning in the fall of 2017 and continuing through to the present time is deliberately indifferent to the rights of children with disability (against whom physical restraint is disproportionately relied on), including J.N., to receipt of public education which is free from discrimination on the basis of disability.

85.   APS, through longstanding policy and practices which plan for and sanction physical restraint against students,  while simultaneously not planning for or training on needs of students with disabilities, particularly children with autism, intentionally discriminated against J.N. during the 2017-18 and 2018-19 school years.  APS staff's repeated reliance on traumatic physical restraints,  in lieu of evidence based practices and interventions which work,  constituted intentional discrimination against J.N. on the basis of disability.

15

86.     APS's failure to implement state law limiting and regulating use of physical restraint and requiring notice to parents, beginning in the fall of 2017 and continuing through to the present time, is deliberately indifferent to the rights of parents, including Plaintiffs, of children with disability who are restrained at school,  to be informed about delivery of public education to their children.

87.      Parents relied on APS's assurances that J.N. was safe at school and were deceived by APS's repeated reliance on physical restraint and failure to provide notice as required, not understanding or being informed of APS's policy of reliance on physical restraint to respond to nonconforming behaviors of children with disability.

88.     APS retaliated against Parents for their questioning and repeated advocacy for J.N.'s rights by conducting "threat  assessment" paperwork labeling J.N. and creating a secret police file on their child.

89.     APS further retaliated against Parents in October 2019 for their advocacy for J.N.'s rights as a student with disability,  including their interviews with *Searchlight New Mexico,* by allowing staff to file false report with CYFD or, alternatively, by allowing an unknown adult, with no identification or credentials, to interview J.N.'s brother in a room alone at school on October 31, 2019 with no reporting or notice to parents, in contravention of multiple APS policies governing visitors to campus and contact with students.


VIII.  NEGLIGENCE ACTION FOR DAMAGES AGAINST APS

90.     APS had actual knowledge that its policies and practices resulted in multiple physical restraints of its students across its school campuses during the 2017-18 and 2018-19

school years.  Its actual knowledge was not shared with parents, including Plaintiffs, since APS

had a longstanding practice of not informing parents about the use of restraint and had failed to

implement the notice requirements mandated by state law after June 2017.

91.    Parents provided APS with a timely Tort Claims Notice on April 15, 2019 for

the physical restraints of J.N.  on January 22, 2019, December 12, 2018 and unknown earlier

dates.

92.    APS counsel acknowledged receipt of the Tort Claims Notice by

letter of May 8, 2018,  and indicated that the District was "in the process of completing a full

investigation."

93.    APS has never provided Parents with the results of its "full investigation" into

physical restraints of J.N.

94.    As a school aged person, J.N. was entitled to attend public school as a

kindergarten student in fall 2017.

95.    When J.N. entered school in August 2017, he was also covered by protections

intended by New Mexico's new law regulating and limiting physical restraint in New Mexico

public school, NMSA §22-5-4.12.

96.    When APS staff used physical restraint against J.N. in 2017-18 and 2018-19, the

use of physical restraint against him was in violation of APS's statutory duties to implement

NMSA §22-5-4.12 in that the restraints were not in response to "imminent danger of serous

physical harm," but instead resulted from staff' lack of knowledge about autism and training to

rely on physical restraint to respond to nonconforming behaviors of students in special education

classrooms.

17

97.    When APS staff used physical restraint against J.N., he was restrained once or more than once in a prone position on the floor, a position which is known to be particularly dangerous and in violation of state law's prohibition against restraint techniques which "impede the student's ability to breathe or speak".  NMSA 22-5-4.12(A)(4).

98.    When APS staff used physical restraint against J.N. in 2017-18 and 2018-19, there was not an "emergency" situation except to the extent APS staff created emergencies by reliance on ineffective, inappropriate interventions which only escalated and provoked nonconforming behaviors from J.N.

99.    When APS staff used physical restraint against J.N. in 2017-18 and 2018-19, APS did not have "school plans" created in accordance with NMSA 22-5-4.12( C).

100.    When APS staff used physical restraint against J.N. in 2017-18 and 2018-19, its schools did not follow the reporting and documentation requirements imposed by state law. NMSA 22-5-4.12(D).

101.    When APS staff used physical restraint against J.N. in 2017-18 and 2018-19, the School District did not employ effective strategies for successfully reintegrating J.N. back into the school in contravention of NMSA 22-5-4.12(F).

102.    APS's failure, through action and inaction of its staff,  to comply with state law, including but not limited to the paragraphs above, was negligent and a breach of its statutory duties to J.N. and his parents.

103.    APS created a dangerous condition for all its students by failing to implement the provisions of NMSA 22-5-4.12 which took effect before the beginning of the 2017-18 school year.  Failure to act to implement the protections of state law exposed APS students to continued

unfettered use of physical restraint during the 2017-18 and 2018-19 school year with no limitations or uniform or accurate required reporting to parents.

104.    APS's failure to implement NMSA 22-5-4.12 during the 2017-18 and 2018-19 school years created a dangerous condition, in particular, for students with disabilities, like J.N. who historically are most often subjected to physical restraint based on APS policy and practice.

105.    APS has waived immunity pursuant to NMSA §41-4-6 (operation of a building).

106.    As a result of APS's negligence, for which immunity has been waived, J.N. and his parents suffered injury and damages.


IX.  IDEA civil action against APS for fees and costs

107.    Parents were the prevailing parties in DPH 1819-23.

108.    Counsel for Parents has provided time and billing records to APS and APS has not indicated dispute with the reasonableness of counsel's rate ($300 per hour) or time expended.

109.    Award of reasonable attorney fees for the IDEA due process hearing is within this Court's discretion pursuant to the IDEA, 20 U.S.C. §1415(i)(3)(B)(i)(I).

110.    Award of fees for the work done at the administrative level on DPH 1819-23 as well as work done and costs incurred in this lawsuit for pursuit of the IDEA fees claims is reasonable as an important procedural right of parents conferred by the IDEA.

111.    Motion practice in accordance with a scheduling order  is the traditional vehicle for determination of entitlement to attorney fees under the IDEA, after filing of this civil action to preserve the IDEA fee claim.

X. PROPOSED CLASS ACTION CLAIMS for equitable relief against APS and NMPED

112.    This action seeks equitable remedy for the minor student, J.N., and all similarly situated Albuquerque Public Schools students with disabilities who have been physically restrained during the 2017-18, 2018-19 and current school year when APS and NMPED have failed to implement NMSA 22-5-4.12.

113.    During these school years and continuing, APS staff's repeated reliance on use of physical restraint against students with disability and staff default to use of physical restraint against students with disability  because staff are untrained in research supported strategies for students with disability, particularly students with autism, demonstrates absence of professional judgment.

114.    During those school years and continuing, APS staff's repeated reliance on physical restraint against students with disabilities in lieu of providing staff training and requiring use of effective evidence based strategies is deliberately indifferent to the rights of APS students with disability to receipt of public education free from disability discrimination.

115.    During the 2017-18 school year, NMPED failed to enact any regulation to enforce NMSA 22-5-4.12 which was intended to limit and regulate use of physical restraint by public school staff against New Mexico students.

116.    During the 2018-19 school year and continuing, NMPED regulation fails to mirror and enforce the state statute in a myriad of ways including most obviously the regulation's permissive language and lack of detail on limitations imposed on use of physical restraint against students.  *See*  §6.11.2.10(E) NMAC *and Compare,* NMSA 22-5-4.12.

117.    APS's and NMPED's failure to implement state law on physical restraint

discriminates against APS students with disabilities who are disproportionately subject to physical restraints which cause them trauma and harm.

118.    After discovery to identify the proper contours of a proposed class of APS students with disabilities, Plaintiffs, who are appropriate class representatives,  will move for class certification for a Rule 23(b) class to seek equitable relief against both defendants for the class to include a) change in state regulation to mirror state law; b) state monitoring of APS implementation of state law; c) APS's full implementation of all provisions of NMSA 22-5-4.12 through required planning, training and monitoring.


## XI.  PRAYER FOR RELIEF

Plaintiffs request the following relief:

1.    Trial by jury on claims as allowed by law;

2.    Award of damages to J.N. against APS for injury suffered as result of APS's negligence and APS's discrimination against him on the basis of disability;

3.    Award of damages to Parents against APS  for injury suffered as result of APS's discrimination against J.N. on the basis of disability in failing to implement state law on use of physical restraint, and as result of APS's illegal retaliation against Parents for their advocacy for J.N. as a student with disability;

4.    Necessary injunctive relief from both defendants for J.N. and an appropriate class of APS students with disability who have been harmed and continue to suffer harm through illegal disability discrimination by NMPED and APS which fail to enforce state law intended to limit and regulate the use of physical restraint against students in New Mexico public schools;

5.    Award of attorney fees and costs against APS for the IDEA administrative due process proceedings on behalf of J.N. as well as necessary work in this civil action to pursue award of IDEA fees, as well as necessary work required by defending the Due Process Hearing Officer decision against any civil action by APS appealing that decision;

6.    Award of attorney fees and costs against both defendants as allowed under federal law for this Section 504 disability discrimination claim on behalf of J.N., Parents, and a proposed class of APS students;

7.    Award of such other relief as the Court deems proper.

Respectfully submitted,

STEVEN GRANBERG, ATTY. AT LAW

*/s/ Gail Stewart*

_____

Gail Stewart
3800 Osuna NE, Suite 1
Albuquerque, NM 87109
(505) 244-3779, x. 3
gstewart@66law.com
*Attorney for Agatha and Malcolm Cooper*